Filed 1/26/26  In re S.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S.B.,<br><br>    Defendant and Appellant. | F088740<br><br>(Super. Ct. No. 19CEJ600077-5A)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko, and Carly Orozco, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

The People allege that defendant S.B., a minor, and two other individuals armed themselves with guns and waited inside a shop for their intended victims before shooting them multiple times. As a result, one of the victims died and another was seriously injured. Based on these allegations, the Fresno County District Attorney's Office filed a juvenile wardship petition alleging defendant committed murder (Pen. Code, § 187, subd. (a)) and attempted murder (Pen. Code, §§ 187, 664).

The People moved the juvenile court to transfer defendant to criminal court pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).[1] Defendant appeals from the order granting the motion and argues substantial evidence does not support the transfer (§ 801, subd. (a)). We affirm.

## PROCEDURAL BACKGROUND

On December 23, 2022, the Fresno County District Attorney's Office filed a juvenile wardship petition under section 602, subdivision (a), alleging defendant committed willful, deliberate, and premeditated murder (Pen. Code, § 187, subd. (a); count 1) and attempted murder (*id*., at §§ 187, subd. (a), 664, subd. (a); count 2). It was alleged that defendant personally and intentionally discharged a firearm causing great bodily injury or death as to both counts (*id*., at § 12022.53, subd. (d)).

On July 22, 2024, the People moved to transfer defendant to a court of criminal jurisdiction under section 707.

On September 26, 2024, after a transfer hearing, the juvenile court granted the prosecution's motion and transferred the matter to criminal court.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code unless otherwise stated.

## BACKGROUND

### I.    Factual Allegations.[2]

Defendant was three months short of turning 17 when the alleged offense occurred.  On December 14, 2022, surveillance video showed J.R., T.D., D.P., and S.S.[3] parking a black car in front of a shop in a strip mall around noon.  T.D. walked back and forth from the shop to the car several times.  He went inside the shop for about a minute each time.  J.R. also entered the store once and remained inside for a couple of minutes before they both returned to the car.  Defendant and two other males were also inside the shop during this time and left soon after.

About five minutes later, defendant and the other two males reentered the shop and gathered near the front door.  Defendant kept his hand inside his jacket pocket as he waited by the front door, looking outside.  One of his cohorts took out a "black 40-caliber handgun."

J.R. and T.D. got out of the black car and walked toward the shop.  As J.R. walked through the front door, defendant's cohort fired the first shot at him, but the gun malfunctioned.  While he racked the gun to clear the jam, defendant began shooting at J.R. and in the direction of the shop's front door multiple times.  T.D. was behind J.R., and once he heard the shots fired, took off running.  Defendant also ran outside and continued to shoot in the direction of the black car, hitting the windshield.  T.D. was shot in the face.  Defendant fired a final shot at J.R. while he was unarmed and collapsed on the sidewalk in front of the car.  J.R. died as a result of multiple gunshot wounds.

---

[2]    The facts are taken from the evidence presented at the transfer hearings.  Whether defendant committed the offenses is not the issue in determining his fitness for transfer from juvenile court to the court of criminal jurisdiction, and the criteria used in making that determination are based on the premise that defendant committed the alleged offenses.  (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 (*Kevin P.*).)

[3]    S.S. is the mother of J.R. and T.D.

Defendant and his cohorts fled along an alley behind the shop and one of his cohorts discarded his black jacket in the dumpster before jumping over a wall behind the dumpster enclosure. D.P. followed defendant and the other two males as they fled. He hid behind an electrical box and watched them run through an alley behind the shop. Thereafter, D.P. retrieved two guns from the dumpster inside a black jacket[4] and they were eventually turned over to law enforcement. One of the guns was a black nine-millimeter "privately manufactured firearm similar to a Glock," with no serial number and a tan grip. The other gun was a 40-caliber, black Glock. Both firearms matched the shell casings from the scene.

Law enforcement investigation revealed the killing was preceded by an exchange of words in the shop when one of the victims asked defendant, " '[What's] up blood?' " Defendant identified as a gang member belonging to the "East Lane Crips". After the exchange of words, defendant and his cohorts came back to the shop after the victims had exited and waited for them to return.

Defendant talked with the shop's clerk by way of text and social media messaging before and after the shooting. On the day before the shooting, defendant bragged about owning guns and told the clerk, "I do the catching. This me 16th gun." The "catcher" refers to the individual who is ambushing another. Defendant told the clerk, he is a "gang member." He also told her, "I keep a gun" and "when I die I [am] going to be remembered." Defendant added, "I [am] going to die with me gun in me hand …."

After the shooting, defendant asked the clerk whether she had spoken to law enforcement. She stated, "I did [not] say nothing." The clerk also told defendant to "delete everything" and defendant agreed. Defendant told the clerk, "[H]e was a sucka" and "I [am] sorry I put you through this." The clerk told him to be safe, and defendant responded, "If they catch me I [am] going under the jail."

---

**4**     The record refers to the black outerwear worn by defendant's cohort as a "jacket" and "sweater" interchangeably. We refer to it as a "jacket" for consistency.

When the clerk was initially interviewed, she was reluctant to provide information and told law enforcement she had never seen the perpetrators before. About a week later, when law enforcement showed the clerk the messages she had sent to defendant, she provided more information. The clerk confirmed defendant's social media alias and told law enforcement that defendant committed the shooting in the shop with another individual.

## II.     Transfer Hearing

### A.      *The probation report.*

The People submitted the probation officer's report on the defendant's behavioral patterns and social history. (§ 707, subd. (a)(1).) The recommendation was based on the five criteria set forth in section 707, subdivision (a)(3).[5] The probation officer's report is summarized below.

The probation officer concluded that the offense showed a high degree of criminal sophistication because defendant and his cohorts planned an attack with weapons drawn at unarmed victims. Defendant and his cohort moved in on the victim in formation and placed themselves in a position of advantage. When one of the victims was on the ground, defendant walked up to him "execution-style" and shot him. After the killing, defendant proceeded to flee and dispose of any evidence. Defendant and his cohort threw their firearms away in a nearby dumpster. The probation officer also noted that defendant appeared on social media after the shooting under an alias to evade detection by law enforcement.

---

[5]     As previously set forth, the juvenile court must consider the following criteria in determining a transfer motion: (1) the "degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, at subd. (a)(3)(B)(i)); (3) the "minor's previous delinquent history" (*id.*, at subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id.*, at subd. (a)(3)(D)(i)); and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id.*, at subd. (a)(3)(E)(i)).

The probation report detailed defendant's delinquent history. Defendant was first adjudged a ward of the court in February 2019 when he stole a car from his grandmother's house. (Veh. Code, §§ 10851, subd. (a); 12500, subd. (a).) In that case, defendant's grandmother woke up from a nap and realized her car was gone. Law enforcement located the car driven by defendant. Once officers initiated a traffic stop, defendant ran from the police. He was released on global positioning system (GPS) monitoring.

Defendant was found to have violated probation a few days later when he was found at two unauthorized locations. He also got in two fights at school, which caused him to be restrained by staff. (§ 625, subd. (b).)

On April 21, 2019, defendant was again adjudged a ward of the court based on findings of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) when he pulled a knife out on his brother during a physical fight.

On July 8, 2019, defendant left home without permission. On the same day, the battery on his GPS monitor died, which resulted in a warrant being issued for his arrest. (§ 777.) Later that month, defendant carjacked another vehicle (Pen. Code, § 211).

On August 7, 2019, defendant stole items from a department store with his brother and three other subjects (Pen. Code, § 459.5) and provided a false name when apprehended by law enforcement (*id*., at § 148.9, subd. (a)).

On March 30, 2020, defendant stole a vehicle (Veh. Code, § 10851, subd. (a)).

On April 13, 2020, defendant was observed driving without a seatbelt. When law enforcement stopped the vehicle, he drove away and hit a picnic table before fleeing on foot (Veh. Code, § 20002, subd. (a)).

Defendant was found to have violated probation for several infractions on July 13, 2020, including being found in unauthorized locations, cutting off his GPS monitor and failing to report to probation, stealing his mother's husband's vehicle, regularly

absconding placement, smoking marijuana, and displaying a poor attitude. Defendant's mother requested his services be terminated.

In November 2020, defendant was declared a ward by associating with gang members, identifying as an "Eastside Lane Crip", and using marijuana. Law enforcement contacted defendant after a high-speed chase, where he was found to be a passenger in a vehicle with other gang members and a pistol. In December 2020, defendant was found in possession of a "mini-assault rifle" containing a high-capacity magazine during a traffic stop.

On January 25, 2021, defendant carjacked a vehicle (Pen. Code, § 215, subd. (a)) while armed with a gun (*id*., at § 12022, subd. (b)(1)). Defendant and two others got into the victim's car at a gas station and asked for a ride. When the victim declined, the juveniles persisted, so she drove away with the juveniles in her car a short distance. Then, defendant climbed from the backseat to the front passenger seat and pointed a black handgun at the victim and told her to get out of the car. A struggle ensued; defendant pulled the trigger and hit the victim on the head with the gun. The victim exited her car, defendant took the victim's purse and drove away.

The probation report also set forth defendant's behavior while incarcerated in the Juvenile Justice System. In July 2021, defendant was in a verbal altercation with another youth. An officer deployed Oleoresin Capsicum (O.C.) spray because defendant failed to comply during the altercation. Defendant also inappropriately touched a female officer.

In August 2021, defendant was involved in two separate altercations with other youths.

In September 2021, defendant was disrespectful and verbally abusive to staff. He resisted when he was asked to return to his pod.

Addressing the success of previous attempts to rehabilitate defendant, the probation officer highlighted the fact that defendant was offered nearly all available resources, including placement services, to deter him from further delinquent behavior.

However, defendant's continued delinquent conduct demonstrated that attempts at rehabilitation were unsuccessful. Defendant was offered services in custody including a 63-day "Pre-Adolescent Program" as well as the 365-day "New Horizons Program." During this commitment, he was offered services to deter further incarceration including being provided a mental health therapist, substance abuse specialists, and a family support therapist. These commitments were followed up by placement services. Defendant served four other custodial commitments for multiple probation violations and was offered services while in custody.

Defendant completed courses in drug and alcohol education, cognitive behavioral therapy, and "Thinking for Change." He received "Most Improved Student" during one of the courses.

Defendant was referred to individual and substance abuse counseling, aggression training, and gang redirection but failed to complete these rehabilitative programs. He also did not comply with the terms of his probation and was on warrant status at the time of his arrest for the instant offense. He struggled completing programs while not in custody.

Moreover, while in custody regarding the instant offense, defendant continued his delinquent conduct.

As to the gravity of the instant offense, the probation officer remarked the defendant's conduct was "serious and violent in nature, ultimately causing a fatality." The probation officer reasoned that the victims were unarmed when the shooting occurred in a public location, and defendant evaded law enforcement for a week before he was apprehended showing he is a high risk of danger to society.

## B.     *Fight at school.*

On September 22, 2022, T.H. was at high school when he saw a water bottle fly toward his head. Suddenly, T.H. was attacked and knocked to the ground. He felt multiple punches and kicks to his body and head. The attack was captured on a cell

phone video.  T.H. identified defendant as his attacker.  T.H. suffered a black eye, bruised lips and legs, and his gums were cut.

### C.     *Forensic psychologist.*

The prosecutor retained a forensic psychologist who completed a forensic evaluation of defendant.  In conducting her evaluation, she reviewed multiple records and reports.  Her observations and opinions from her reports and testimony are summarized below.

While defendant had a substance abuse issue that may have played a role in his judgment, defendant had no significant mental health issues at the time of the offense that would have directly contributed to his behavior.

The psychologist considered the five transfer criteria set forth in section 707.  She concluded defendant does not exhibit criminal sophistication.  Although defendant waited in the shop in a "predatory manner" and immediately shot at the first victim as he walked through the door, defendant had a history of impulsivity and a self-reported attention deficit hyperactivity disorder (ADHD).  With respect to the current offense, defendant did not attempt to conceal his identity.  The offense appeared to have been motivated by the influence of older mentors and defendant's gang ties.  He communicated with the clerk of the shop that the victims had provoked him by stating, " '[W]hat's up, blood' "

With respect to the likelihood of rehabilitation, the psychologist opined it was unlikely defendant could be rehabilitated before the expiration of the juvenile court's jurisdiction.  The psychologist discussed defendant's difficult childhood and lack of parental figures.  She noted his mother's drug use, and his father's gang membership and incarceration during his youth.  Defendant's behavior problems continued even after Child Protective Services intervened and he was placed in the custody of a family member.  The psychologist found defendant's gang affiliation was a "major roadblock" in evaluating the likelihood of success of further rehabilitation.  She also noted defendant's academic struggles, family history of criminality, and substance abuse

history that obstructed defendant's ability to change.[6]  Finally, she commented that defendant had not been benefitting from the treatment he previously participated in and had increasingly violent behavior.

As to defendant's previous delinquent history, the psychologist found that this factor weighed in favor of transfer to criminal court.  She began by discussing defendant's prior delinquent behavior starting at age 12.  The psychologist commented that defendant's behavior was indicative of an "anti-authority pattern."  His behavior escalated in severity over the course of four years, including multiple arrests, delinquent behavior at school and in the community, and use of weapons during the commission of his crimes.

Addressing the success of previous rehabilitation attempts, the psychologist opined this factor weighed in favor of transfer to criminal court.  Defendant received a multitude of services over the years but was never able to make consistent progress.

Finally, the psychologist opined that the circumstance and gravity of the offense favored transfer.  She noted defendant played a "significant role" in the offense and shot at the victims' multiple times.  She also discussed the victim's mother who was present at the scene and watched her son die.

Thus, the psychologist concluded that four of the factors weighed in favor of transfer to criminal court.

**D.    *Other evidence.***

There was evidence presented regarding defendant's behavior while in custody. The following is a summary of that evidence.

On September 9, 2021, defendant screamed profanities at an officer and made several disrespectful comments to authority throughout the day.

---

**6**    At the time of the transfer hearing, defendant's older brother was in custody pending murder charges as an adult.  Defendant's father was also previously incarcerated.

In October 2021, defendant was in a physical fight with another youth. He also tried to hit another youth on a separate occasion later that month. It was noted that defendant had a poor attitude, "does not seem to care about the program" and continues to cause "security issues" by not following the rules.

On December 3, 2021, defendant attempted to attack another youth.

In January and February 2022, defendant got into verbal disputes with youth.

On February 26, 2022, it was documented that defendant "needs to be watched closely" due to his "out of control" behavior.

On March 23, 2022, defendant refused to participate in mandated programming and got into a verbal argument with another youth.

In October 2022, defendant was in two physical fights with other youth.

While in custody in the instant matter, in May 2023, defendant was kicked out of his class at school. His supervising officer commented that defendant refused to go to school daily.

On July 23, 2023, defendant became enraged because he was denied an extra snack and screamed profanity and threatened supervising officers. He told them he was an "East Lane Crip."

On August 3, 2023, defendant refused to follow directions and was disrespectful, aggressive, threatened officers, staff, and other youth in the facility. About a week later, another youth was sitting in the corner on the computer and defendant walked by and punched him in the head about five times. The two males got into a physical altercation, which ended when an officer deployed O.C. spray. Another incident occurred later that month when defendant refused to obey the rules.

On October 19, 2023, defendant threatened an officer with bodily harm and refused mental health services. Later that month, defendant slapped another youth.

11.

On November 14, 2023, defendant was suspended because he threatened a teacher. Thereafter, defendant's phone privileges were revoked due to "constant misuse" of the phone, failing to follow the rules, and regularly presenting safety and security issues.

On December 28, 2023, defendant denied mental health issues and refused mental health services.

On January 11, 2024, a verbal altercation escalated into a physical fight between defendant and another youth.

On February 16, 2024, defendant got into a physical altercation with another youth.

Since July 2023, an officer opined that defendant's behavior improved. Another officer testified defendant's behavior worsened over time.

### E. *Defense evidence.*

A juvenile correctional officer opined that defendant's behavior during the programs he attended while in juvenile hall were not unusual or "too extreme." She pointed out that defendant had some "good days."

A juvenile hall employee opined that defendant was generally compliant while in the juvenile justice system.

An employee at the Juvenile Justice Campus testified defendant was always "very respectful" during her shifts. In the past year, defendant's behavior improved.

Defendant participated in a 12-week gang redirection program. He was engaged in the program and received a completion certificate.

Defendant's mother testified that she was a victim of domestic violence around the time he was born. Defendant was eight years old when he witnessed his father act violently toward his mother.

Defendant's mother lost custody of him in 2014 because of her drug use; he went to live in a facility and then with a family member. According to his mother, defendant

12.

suffered abuse while at the facility.[7] At some point thereafter, defendant's mother regained custody of him.

Since his arrest in the current offense, defendant's mother stated defendant has grown, shows respect, and she has authority over him. Nonetheless, defendant's mother could not recall when he was on GPS monitoring, did not know he was on warrant status prior to the murder, and did not answer several of probation's calls regarding defendant's behavior.

### F.    *Juvenile court's ruling.*

The juvenile court granted the People's transfer motion, finding "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." The court evaluated the five criteria set forth in section 707 and found that each of the five factors weighed in favor of transfer. The court explained its reasoning as follows:

> "Concerning the degree of sophistication exhibited by the minor, the Court is to consider the minor's age, maturity, intellectual capacity and physical, mental and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate the risk and consequences of criminal behavior, the effect of familial adult or peer pressure on the minor's actions, the effect of the minor's family and community environment, the existence of childhood trauma, the minor's involvement in the child welfare or foster care system, and the status of the minor as a victim of human trafficking, sexual abuse or sexual battery on the minor's criminal sophistication.

> "[T]he minor was three months short of turning 17 when the alleged offense occurred.

> "[Defendant's] grandfather reported that the minor indicated he wanted to kill himself on … the day of his arrest. While the Court notes that … can indicate a mental health issue, the Court interprets that statement as it relates to the minor's Instagram message to … the clerk of the smoke shop

---

[7]    Albeit this claim by defendant's mother, there was no further evidence presented that showed the abuse actually occurred.

13.

where this incident occurred, days after the shooting. Quote, if they catch me, I [am] going under the jail, unquote. Within the context of the fact that … defendant … was arrested and knew that he would be spending potentially substantial time in custody, the statement about wanting to kill himself was made. Considering those statements together, I think it [is] important to understand that the statement does not suggest mental health issues … [defendant's] mother denied that he was experiencing any mental or physical health issues. [The psychologist] opined that no significant mental health issues contributed to this incident.

"A review of the educational history of the minor suggests that there [are] significant deficiencies concerning his learning, and those deficiencies would impact other issues that the Court will address.

"The Court notes that the minor did have a disruptive life where he was removed from the home and taken in by an aunt and uncle, but he … still [had] contact with at least his mother. And there [is] no indication that being away from the mother impacted his ability to grow or impacted his involvement in this crime. In fact, some have said that he … is just anti-authoritarian, whether it is parents, law enforcement or anyone telling him what to do.

The Court finds that petitioner has met their burden regarding this factor.

"The court notes that [the psychologist] indicated that while there is substance abuse behavior, there is no physical connection between that behavior and the planning and the [i]mpetuosity in this case. There [is] no … significant mental health issue that contributed to the offense and no direct link to mental illness .…

"The Court notes that there was planning suggested here in that based upon the videotape evidence … defendant and others left, then returned to the scene of this crime, entered the … shop, and then … lay in [wait] for the victims to enter. While the conduct which was detailed by the probation officers who testified of the minor yelling and name calling in inappropriate situations is evidence of immaturity for a 17-year-old stated by [the psychologist] it may present simply a … dispositional component .…

"So the Court finds that this factor [militates] for transfer to the criminal court.

14.

"Next issue is whether the minor can be rehabilitated prior to expiration of the juvenile justice jurisdiction. Welfare and Institutions Code Section 707[, subdivision] (a)(3)B[ii] provides that any relative factor included, but not limited to, the minor's potential to grow and mature should be considered. [Defendant] is …18 years, six months and nine days of age. He was 16 years, 8 months, 25 days of age when the offense occurred.

"The Court finds that the minor has been offered a multitude of services based upon the probation report, that he [has] been offered individualized therapy as well as substance abuse therapy, that he participates but fails to implement what he has learned and returns or repeats the same conduct. [The] Court notes that continued violence has occurred while he [is] been detained at [Juvenile Justice Campus]. And the Court finds it significant that [defendant] completed the gang redirection program before the shooting that underlies this petition. [The psychologist] noted that antisocial behavior is difficult to address because there are multiple areas that are impacted … the gang lifestyle is a major road block. In this instance [defendant] became a member of the street gang at the age of 12. And even after the shooting was making comments to the effect that he wanted to, about being remembered when he dies and that he intended to die with his gun in his hand. Given the apparent strength of the gang ties, the lack of academic achievement or educational ability, and that [is] what I said earlier I was going to refer to that. The educational history suggests that [defendant] was failing all of his classes when he left … [h]igh [s]chool.

"The Court finds the petitioner has met the burden regarding this factor. And this factor [militates] for transfer to the criminal court.

"The Court notes also that while [defendant] has been detained at the [Juvenile Justice Campus], violence has continued to be brought by [defendant].

"Third, the Court is to consider the minor's previous delinquent history …. In this regard the Court is to consider any relevant factor including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior.

"The minor's previous delinquent behavior includes most recently the petition for assault by means likely to produce great bodily injury, and that [is] the incident involving [T.H.] Vehicle Code Section 10851 from

15.

2019. There was a [Penal Code section] 211 robbery from 2019. Carjacking from 2021. Violation of Penal Code Section 215, and that was with the use of a … gun. The Court finds that petitioner has met their burden regarding this factor and that this factor [militates] for transfer to criminal court. The minor's conduct has escalated, has become more associated with weapons, and at least if the social media contacts that the minor had with the witness to the shooting are to be taken seriously, the gun that he had and discarded in this instance allegedly, was his 16th gun.

"Next is the Court is to consider the success of previous attempts by the juvenile court to rehabilitate the minor.… Here the Court is to consider any factors including, but not limited to, the adequacy of services previously provided to address the minor's needs. The probation report details the attempts that have been made since 2019. There was a commitment to the New Horizons program, there was a seven-week drug and alcohol education course, there was the cognitive behavioral therapy class which was completed, and Thinking for a Change class which was completed, but yet the violent behavior has continued.

"The Court finds that the petitioner has met their burden for this factor and that this factor [militates] for transfer to the criminal court.

"Finally, the Court is to consider the gravity and circumstances of the offense alleged in this petition.… [The] Court is to consider any relevant factors included, but not limited to, the actual behavior of the minor, the mental state of the minor, the minor's degree of involvement in the crime, the level of harm actually caused by the minor, the minor's mental and emotional development, and any evidence offered that indicates that the person against whom the minor is accused of committing an offense traffic, sexually abused or sexually battered the minor. There [is] no evidence of that whatsoever.

"In this case there [is] a video. It shows that on December 14, 2022, the minor and a second gunman fatally shot [J.R.] and wounded [J.R.]'s brother after lying in wait for the pair to enter the … [s]hop .… The incident was captured on interior and exterior video surveillance. The shooting took place in broad daylight in the presence of the … shop cashier as the victim's mother sat in the vehicle feet away from the doorway where her son would fatally fall and where other citizens conducted business at this busy strip mall .…

"[Defendant] was 16 years, nine months old when he repeatedly pulled the trigger of the firearm … and … I disagree with [the psychologist]. She was of the opinion that the manner in which the minor did not attempt to mask

16.

his face during the incident show[ed] a lack of sophistication.  I tend to disagree with that because the minor did not feel he needed to hide his face because he was well known to the clerk, the witness inside the store.  When he and the others entered, he had already a budding relationship with her where he believed that she was loyal and that they would protect one another.  She would not say anything.  And in fact, she did not say anything initially.  She did not identify the minor, and that [is] where the social media between the two is very telling of the minor's mental state at the time and after the shooting of this individual.  Their messages after the shooting attest to his belief and her complacency as well as his attempts to confer her loyalty.  So he did [not] hide his face because he did [not] feel that he needed to, that she would not ever say anything about him or against him.

"The degree of involvement I [have] already alluded to.  He pulled the trigger several times and even upon exiting the [shop] when the victim was on the ground he fired another shot into his body before fleeing around the building where he and others discarded their firearms in a dumpster where they were later recovered according to the testimony, and he then continued to have contact with the witness inside the store using a pseudonym, a false name, so as to hide his identity from anyone who may have been tracking her information.  So his degree of involvement was very high.

"The level of harm caused the death of one individual and a serious injury to another.

"The Court believes the People have … sufficiently met their burden regarding this factor and that this factor [militates] for transfer to the criminal court.

"Based upon all the foregoing reasons, the Court finds that [defendant] should be transferred to the jurisdiction of the criminal court.  The Court also finds that this individual was under the age of 18 at the time of the alleged criminal offense."

## DISCUSSION

I. **There Was No Abuse of Discretion in Transferring Defendant to Criminal Court.**

Defendant argues the juvenile court abused its discretion in ordering transfer to criminal court because the evidence was insufficient to support the court's finding as to all five criteria set forth under section 707, subdivision (a)(3)(A) though (E).  He also

17.

argues the court improperly evaluated the statutory factors. The People disagree and maintain the juvenile court properly considered these factors and substantial evidence supports the conclusion that defendant is not amenable to rehabilitation under juvenile jurisdiction. We agree with the People.

### A. *Applicable law and standard of review.*

The procedures for transferring a minor from juvenile court to criminal court are set forth under section 707. It provides that whenever a minor 16 years or older is alleged to have committed a felony, the prosecutor may move "to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).)

Upon receiving a transfer motion, "the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) The court may consider "any other relevant evidence" submitted in addition to the transfer report. (§ 707, subd. (a)(3); *Kevin P., supra*, 57 Cal.App.5th at p. 186.)

The burden is on the People to establish "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); Cal. Rules of Court, rule 5.770(a); *In re E.P.* (2023) 89 Cal.App.5th 409, 416.) The clear and convincing evidence standard "demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)

In making the determination to transfer, the juvenile court is required to consider five factors: (1) "the degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, at subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (*id.*, at subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (*id.*, at subd. (a)(3)(D)(i)); and (5) "[t]he

18.

circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (*id*., at subd. (a)(3)(E)(i)).  The weight to be given to each of the five criteria is within the court's discretion.  (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 417; *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1034–1035.)  In addition, section 707 "sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria.  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)"  (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164.)

Effective January 1, 2024, Senate Bill No. 545 (2023–2024 Reg. Sess.) "amended section 707 to require that with respect to each of [the] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion.[8]  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)"  (*Miguel R., supra*, 100 Cal.App.5th at p. 164.)

We review the juvenile court's determination to transfer a minor to criminal court for abuse of discretion.  (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 714; *Miguel R., supra*, 100 Cal.App.5th at p. 165.)  "The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo.  [Citation.]  A decision based on insufficient evidence or the court's ' "erroneous understanding of applicable law" ' is subject to reversal."  (*Kevin P., supra*, 57 Cal.App.5th at p. 187.)

"Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "  (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1006.)  Because transfer is subject to the clear and convincing evidence standard, we "must determine whether the record, viewed as a whole, contains substantial

---

**8**     The previous version of the statute made consideration of those factors discretionary, not mandatory.  (See Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii); *In re Miguel R., supra,* 100 Cal.App.5th at pp. 164–165.)

evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Id*. at p. 1005, fn. omitted.)

In reviewing for substantial evidence, we draw all reasonable inferences in support of the juvenile court's findings. (*Miguel R*., *supra*, 100 Cal.App.5th at p. 165.) We do not reweigh the evidence and "must accept the fact finder's resolution of conflicting evidence." (*Conservatorship of O.B*., *supra*, 9 Cal.5th at p. 1008.)

## II. The Juvenile Court's Findings Were Supported by Substantial Evidence.

### A. *Degree of criminal sophistication.*

When evaluating the degree of criminal sophistication exhibited by the minor, section 707 requires the juvenile court to "give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707 subd. (a)(3)(A)(ii).) To assess this factor, the juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 683–684.) The question of guilt is not at issue at a transfer hearing, thus, the court presumes "that the minor did, in fact, commit the offense." (*Id*. at p. 682.)

Here, the juvenile court found the circumstances of the offense demonstrated, by clear and convincing evidence, that defendant had a high level of criminal sophistication. We agree. The crime was not impulsive but indicative of deliberation and planning, which supports a finding of deliberation and criminal sophistication. (*People v. Superior*

20.

*Court (Jones), supra*, 18 Cal.4th at p. 684 ["The minors planned the offense in considerable detail"]; *In re J.S.* (2024) 105 Cal.App.5th 205, 214 ["The crimes were not spontaneous or impulsive but were indicative of deliberation"].)

Defendant armed himself with a gun in advance of the murder. He kept his hand in his pocket and laid in wait for the victims to enter. He fired multiple shots at unarmed victims. Defendant returned to J.R. after he had already fallen on the sidewalk and rendered one last shot at him, execution style, suggesting he acted with the intent to kill. Considering the whole picture, the court rightly found defendant's conduct evinced a high degree of criminal sophistication.

Defendant contends he presented evidence of impulsivity and child-like behavior, and the juvenile court got the facts wrong regarding the sophistication of the crime because he did not wear a mask when he committed a murder in broad daylight. We first point out that the court noted defendant's immaturity, however, found this evidence did not negate the fact that the crime involved considerable preparation. There was also evidence that showed defendant did not feel like he needed to wear a mask due to his relationship with the shop's clerk.

Moreover, the lack of a mask does not render the crime unsophisticated. (*People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at p. 684 [while the defendants were " 'inept' " and did not elude arrest, substantial evidence supported a finding that the defendants' conduct was " 'unsophisticated' " because there was considerable evidence of planning before execution of the robbery].) There was other evidence which showed criminal sophistication. Defendant was armed prior to the shooting. He disposed his gun in a dumpster after the crime occurred. He conferred loyalty with the shop's clerk. He requested that she not to speak to law enforcement. The offense was gang related. This provided sufficient evidence to support the court's finding of criminal sophistication. (See, e.g. *Jones*, at p. 684 ["[T]o avoid detection, [minors] disposed of evidence linking

21.

them to the offense"]; *Kevin P.*, *supra*, 57 Cal.App.5th at p. 193 ["attempts to cover up … involvement in the crime" supported finding of criminal sophistication].)

Defendant further argues the juvenile court erred when it concluded that the crime was sophisticated by failing to find that his mental health and substance abuse played a role in the crime. (§ 707, subd. (a)(3)(A)(ii).) Defendant ignores the appropriate standard of review. "[T]he existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence. In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them. [Citation.] We consequently are concerned only with whether ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' [Citation.] When evidence reasonably justifies the trier of fact's findings, ' "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 169.)

The juvenile court expressly acknowledged that defendant indicated he wanted to kill himself the day after his arrest, but the court found this did not show defendant suffered from mental health issues because his comment was stated in the context of coming to the realization that he would potentially be spending a substantial time in custody. There was also evidence showing defendant did not suffer from problems related to mental health. After his arrest in the current offense, defendant denied mental health issues.

The court also acknowledged defendant's substance abuse. However, evidence from the psychologist supported the court's ultimate finding that there was nothing to indicate defendant had used any substances the day of the shooting or that his substance abuse contributed to the commission of the crime. Defendant regularly demonstrated an anti-authoritarian behavior. On this record, we cannot find the juvenile court failed to properly consider evidence of mental health and substance abuse.

22.

In sum, defendant's participation in a targeted, deadly shooting supported the juvenile court's finding that defendant exhibited a high degree of criminal sophistication. Nothing indicates that the court's conclusion on this factor was based on an erroneous finding not supported by the record. Thus, the court's finding as to this criterion was supported by substantial evidence.

**B.**      ***Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction.***

The juvenile court must determine whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (§ 707, subd. (a)(2)(B)(i).) The court may give weight to any relevant factor, "including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (*Id*., at subd. (a)(2)(B)(ii).) The court's focus is "whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.) "[T]he prosecution accordingly 'bears the burden of producing evidence of insufficient time to rehabilitate the minor.' " (*Id.* at p. 167; Cal. Rules of Court, rule 5.770(a).) "A juvenile court can retain jurisdiction over a minor … for the offense of murder until he or she attains 25 years of age .…" (*In re J.S.*, *supra*, 105 Cal.App.5th at p. 213; §§ 607, subd. (c), 1769, subd. (b).)

The probation officer concluded that despite being "afforded nearly all available resources," defendant's rehabilitative needs "surpass" the resources available through the juvenile court. Considering the evidence presented at the transfer hearing, the juvenile court soundly reached the same conclusion. The court focused on the multitude of services offered to defendant and his lack of progress and continued violence since becoming a ward of the court at age 12.

Defendant was repeatedly provided programs to address substance abuse, mental health, behavior, lack of family support, gang membership, and other issues. In looking at defendant's probation history, defendant showed an increase in violent behavior. He began using lethal weapons. He also exhibited violent behavior in custody. Even after committing the instant offense, he committed an assault, possessed prescription drugs, and exhibited other threatening and hostile behavior. The psychologist concluded defendant did not understand how to meaningfully utilize the services provided to him to make a positive change.

The court also focused on defendant's strong gang ties and lack of academic achievement. Defendant completed a gang redirection program not long before the instant gang-related offense occurred. He told the shop's clerk he was a gang member and wanted to die remembered with a gun in his hand.

Defendant concedes it appears he had a lack of progress despite several rehabilitative services offered. However, he argues the juvenile court failed to appreciate his most recent efforts, pointing to his probation officer's comments that he had "good days and bad days," and his behavior was not unusual compared to other youth in the facility. He also points to evidence showing he was compliant at times and demonstrated improvement while on probation. However, defendant ignores the evidence showing significant history of violent misconduct despite extensive participation in rehabilitation programs for several years. This provided a sufficient basis to find that additional efforts to rehabilitate defendant in the juvenile justice system would not be productive. (Cf., *J.N. v. Superior Court*, *supra*, 23 Cal.App.5th at p. 722 [there was no evidence that demonstrated existing programs were unlikely to result in the defendant's rehabilitation or why they were unlikely to work].)

Defendant also argues the juvenile court failed to appreciate the length of time it would have in rehabilitating him if he remained in juvenile jurisdiction. But the court expressly considered defendant's current age and concluded that based on his prior

24.

rehabilitative efforts, he would be unsuccessful in further rehabilitative programs as a juvenile. Moreover, there is nothing in the record that indicates the court failed to assess the time he had to rehabilitate if he stayed in juvenile jurisdiction. We presume the court was aware of and applied the applicable law when assessing the length of time defendant would have to be rehabilitated before the expiration of the juvenile court's jurisdiction. (See, e.g. *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)

There was ample history of delinquency and multiple failed attempts to rehabilitate defendant from which the juvenile court could conclude that future rehabilitative efforts would be unsuccessful. Accordingly, the juvenile court's finding that this criterion weighed in favor of transfer was supported by substantial evidence, and no abuse of discretion occurred.

### C. *Previous delinquent history.*

"The minor's previous delinquent history" must be assessed under section 707, subdivision (a)(2)(C)(i). In doing so, the juvenile court "may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).)

The juvenile court concluded defendant's previous delinquent history "escalated" in violence and became "more associated with weapons," which weighed in favor of transfer to criminal court. Substantial evidence supported the court's finding on this factor.

The probation officer's report detailed this history. At the age of 12, defendant stole a car. A few months later, he used a knife during an altercation with his brother. Later in 2019, he stole property at a department store. Defendant carjacked a woman's car while she was sitting in the driver's seat by kicking her in the face. In 2020, defendant stole a car. He failed to obey a police officer. He was thereafter caught with a loaded "mini-assault" rifle and identified as gang member. In 2021, defendant assaulted

a victim with a gun while at a gas station and carjacked her vehicle. In September 2022, defendant assaulted another student at his high school. The victim sustained numerous blows to his body and head. He also suffered multiple probation violations during the time he was a ward of the juvenile court. Defendant sent a text message before the shooting which stated it was his "16th gun."

We liken our case to *In re J.S., supra*, 105 Cal.App.5th 205. There, the "juvenile court recounted [the defendant's] previous contact with law enforcement, including bringing a knife to school, trespassing, robbery, theft, and failing to fulfill the terms of his probation." (*Id*. at p. 214.) The Second District found this previous delinquent history amply supported transfer to adult court. (*Id*. at p. 215.) Here, defendant's previous delinquent history, escalating in weapon use and violence, both in and out of school, supports the juvenile court's finding on this factor.

Defendant argues the juvenile court failed to consider his troubled upbringing, including his childhood trauma, prior abuse, and neglect. However, the court considered all the evidence presented, including the psychologist's observations regarding defendant's trauma and disruptive family life. But the court chose a different conclusion.

While defendant was removed from his home and taken by relatives, he had some contact with his mother. There was no evidence that showed defendant's time away from his mother impacted his involvement in the crime. His mother regained custody of defendant in about 2018, yet he still immersed himself in the gang lifestyle and his behavior worsened. Defendant's argument asks us to substitute our judgment for that of the juvenile court, something we cannot do. (See *In re J.S.*, *supra*, 105 Cal.App.5th at p. 208.)

The court's determination regarding defendant's previous delinquent history was supported by substantial evidence.

**D.** *Success of previous attempts to rehabilitate the minor.*

In determining suitability under juvenile jurisdiction, the court must consider the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(3)(D)(i).) In evaluating this criterion, the court "may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (*Id*., at subd. (a)(3)(D)(ii).)

The juvenile court found this criterion weighed in favor of transfer based on the history of unsuccessful attempts to rehabilitate defendant since 2019. The court's conclusion was supported by substantial evidence. Defendant underwent a variety of different rehabilitative programs and nevertheless continued to engage in increasingly violent behavior. Defendant served several custodial commitments addressing mental health, substance abuse, family support, and other issues aimed at deterring further incarceration. He also received referrals to other programs but failed to complete them.

Defendant argues the services were inadequate to meet his unique needs. (§ 707, subd., (a)(3)(D)(ii).) Defendant contends he "required lots of personal attention." We disagree. Defendant was referred to various rehabilitative programs to address his needs. He either failed to complete the programs or immediately continued his delinquent conduct once completed. Defendant simply failed to make any significant progress despite being offered many years of services.

Defendant noted programs that he successfully completed and argues that he has a potential for rehabilitative success. We recognize that defendant completed several programs while in custody and received "Most Improved Student" during a drug and alcohol education course. However, his inability to refrain from violence and misconduct despite some progress shows these programs did not rehabilitate him in any meaningful way.

Defendant finally argues the juvenile court failed to appreciate the goal of rehabilitation, rather than punishment by incarceration. He has been under the juvenile court's jurisdiction since he was nearly 13 years old. He has been provided nearly every available resource the juvenile justice system as to offer. Even while in custody on the instant charges, he engaged in violent conduct, name calling and cursing at staff, and stated that he does not care about the rules. The record shows the court very much appreciated the significance of its decision to transfer defendant to criminal court, but nonetheless rightly concluded that transfer was warranted due to years of rehabilitative programming with little progress. Thus, this criterion weighed in favor of transfer and was supported by substantial evidence.

### E. *The circumstances and gravity of the offense.*

Section 707, subdivision (a)(3)(E)(ii) directs the court to consider "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." When assessing this factor, "a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude.' " (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 189.)

The juvenile court began its analysis of this factor by discussing what the surveillance videos showed. Defendant and two others lay in wait at a shop for their intended victims to enter. As soon as J.R. crossed the threshold of the shop, defendant repeatedly pulled the trigger. He ran outside, continued to shoot in the direction of the victims' vehicle, and fired a final shot at J.R. while he was collapsed on the sidewalk. The shooting took place in broad daylight in a strip mall where there were others conducting business, and in the presence of the J.R.'s mother who sat in her vehicle a few feet away. The court concluded this criterion weighed in favor of transfer because "[t]he level of harm caused the death of one individual and a serious injury to another."

The juvenile court's finding was supported by substantial evidence. Here, there was evidence of preparation that occurred before the murder. Moreover, considering the amount of times defendant pulled the trigger, and the evidence which showed he shot J.R. even though he was collapsed on the ground, indicates defendant acted with the intent to kill. The evidence also shows defendant fled, took steps to avoid detection, and discarded the gun, which demonstrated he understood and appreciated the wrongfulness of his conduct. Defendant was directly involved in the murder and specifically targeted his victims, supporting the juvenile court's finding this criterion weighed in favor of transfer.

Defendant maintains the juvenile court "absolutely failed to evaluate or give any credence" to defendant's mental state, mental and emotional development, ADHD diagnosis, substance abuse, and traumatic upbringing. His contention is without merit. The juvenile court explicitly stated it considered defendant's childhood trauma, disruptive family life, and discussed the psychologist's indication there was a substance abuse factor. But the court found no connection between defendant's childhood trauma, mental health, or substance abuse to the execution of the crime. The court's reasoning was sound.

F. ***Substantial evidence supports the juvenile court's ultimate finding that defendant is not amenable to rehabilitation while under juvenile jurisdiction.***

The juvenile court found by clear and convincing evidence that each of the five section 707 factors weighed in favor of transfer, and we have concluded the court's findings were supported by substantial evidence. We therefore reject defendant's claim that the juvenile court failed to appropriately weigh or apply the relevant factors to the evidence in this case.

29.

We conclude the record contains substantial evidence that defendant was not amenable to treatment as a juvenile, and that the juvenile court did not abuse its discretion by granting the motion to transfer him to adult criminal court.

## **DISPOSITION**

The order of the juvenile court is affirmed.

LEVY, J.

WE CONCUR:

HILL, P. J.

MEEHAN, J.